**UNITED STATES of America**

v.

**Patrick SEWARDS.**

**No. 92–00570–01.**

United States District Court, E.D. Pennsylvania.

March 22, 1995.

J. Alvin Stout, III, Asst. U.S. Atty., Philadelphia, PA, for the government.

Thomas A. Bergstrom, Philadelphia, PA, for defendant.

## *OPINION AND ORDER*

VAN ANTWERPEN, District Judge.

On December 8, 1992, defendant Patrick Sewards pled guilty to one count of unlawful distribution of diazepam (valium) in violation of 21 U.S.C. § 841(a)(1).[1]  On April 7, 1993, we sentenced Dr. Sewards to three months incarceration to be followed by three years supervised release.  He has now filed this habeas corpus petition to permit him to withdraw his guilty plea, vacate his conviction and sentence, pursuant to 28 U.S.C. § 2255, and set the matter for trial.[2]

In his petition, Dr. Sewards alleges that he was denied effective assistance of counsel because his attorney, James Heidecker, failed to recognize and advise defendant that defendant's alleged drug abuse could negate the intent element of his narcotics distribution charge.  Defendant thus contends that his subsequent guilty plea was not knowing and voluntary.  Defendant also alleges that he was denied effective assistance of counsel at sentencing because Attorney Heidecker failed to present mitigating evidence of his drug addiction.  We held an evidentiary hearing (hereinafter "hearing") in this matter on November 22, 1994.[3]  The parties subsequently filed supplemental briefs.  Based on Dr. Sewards' motion and accompanying memorandum, the government's responsive memorandum, the evidence presented at the evidentiary hearing, and the supplemental briefs, we now address Dr. Sewards' petition.

## I.  FACTUAL BACKGROUND

On April 18, 1990, Charles Calabrese met with petitioner, Dr. Patrick Sewards, a practicing medical doctor and surgeon, in the latter's office in Abington, Pennsylvania.[4]  Calabrese had previously been treated by Dr. Sewards for an injured knee, but an illegal relationship developed between the two in which Mr. Calabrese purchased prescriptions for controlled substances from Dr. Sewards.[5]  Unbeknownst to Dr. Sewards, Calabrese had become a government informant for the Drug Enforcement Agency ("DEA") and was wearing a hidden recording device on that day.  During the course of the

---

1.  21 U.S.C. § 841(a)(1) provides as follows:

    **§ 841.  Prohibited acts A**
    (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
    > (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

2.  Dr. Sewards is currently serving out the remainder of his three years of supervised release which is considered "custody" for 28 U.S.C. § 2255 purposes.  *See U.S. v. DeGregory,* 220 F.Supp. 249, (E.D.Pa.1963), *aff'd* 341 F.2d 277 (3rd Cir.1965), *cert. denied* 382 U.S. 850, 86 S.Ct. 96, 15 L.Ed.2d 89, (1965), *reh'g denied* 382 U.S. 933, 86 S.Ct. 317, 15 L.Ed.2d 346 (1965); *U.S. v. Sinclair,* 702 F.Supp. 477 (D.Del.1989).

3.  28 U.S.C. § 2255 provides, in relevant part, that in an action to vacate or correct the sentence, the court shall grant a hearing to determine the issues and make findings of fact and conclusions of law "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief...."

4.  The facts surrounding the basis of the indictment against Dr. Sewards have been gleaned from the Government Response to Petitioner's Petition to Vacate Conviction and Sentence.  These facts are not at issue in this petition and they have not been disputed by the petitioner.

5.  Calabrese believed that Dr. Sewards had already been selling diazepam to Calabrese's cousin, Robert Ivins.

meeting, Calabrese asked Sewards if he could get him a case of diazepam, a Schedule IV controlled substance, often sold under the brand name valium. Dr. Sewards agreed to sell Calabrese 5000 dosage units of diazepam for $550.[6] A pharmaceutical wholesaler in New York subsequently received Dr. Seward's order for 50 bottles of diazepam, each containing 500 dosage units. The DEA, however, instructed the wholesaler to only ship Dr. Sewards 10 bottles, which it did at a price of $9 per bottle.

On April 30, 1990, Calabrese returned to Dr. Seward's office with $550 of government money, and again wearing a hidden recording device. Dr. Sewards sold Calabrese 8 bottles of diazepam for $480 and told him that the remainder of his diazepam order would be in by the end of the week. Calabrese met with Dr. Sewards again in Sewards' office on four subsequent occasions.

On September 30, 1992, Dr. Sewards was indicted for one count of unlawful distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1). The indictment was based on Dr. Sewards' sale of 946.8 grams of diazepam to Calabrese on April 30, 1990. Dr. Sewards initially entered a plea of not guilty to this charge. On December 8, 1992, at the commencement of his jury trial, Dr. Sewards changed his plea to guilty in a lengthy colloquy. On April 7, 1992, Dr. Sewards was sentenced to three months imprisonment to be followed by three years supervised release, a fine of $10,000, restitution of $480, and a special assessment of $50. (N.T., 4/7/93, pp. 101–105). This sentence was based on an initial total offense level of 10, criminal history category 1, with a two point reduction for acceptance of responsibility agreed to by the government. Based on the stipulation by the parties, we granted the two point reduction resulting in an offense level of 8. (N.T., 4/7/93, p. 89). The sentencing guideline range therefore was 0 to 6 months.

Defense motions for downward departure based upon U.S.S.G. §§ 5K2.12 (coercion and duress) and 5K2.0 (II) (aberrant behavior) were denied. (N.T., 4/7/93, pp. 89–91). Throughout these proceedings, Dr. Sewards was represented by Mr. James Heidecker, an Allentown attorney who had represented Dr. Sewards since February 1991 in his ongoing divorce and separation proceedings. (N.T., 11/22/94, p. 24).

On September 9, 1994, Dr. Sewards filed this petition to withdraw his guilty plea, and vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. An evidentiary hearing was held on the matter on November 22, 1994. At the hearing, Dr. Sewards stated for the first time before this court that he had abused amphetamines and methamphetamines from 1981 to approximately January 1991, including the period of the charged offense. (N.T., 11/22/94, p. 6). He described the symptoms of his abuse as being weight gain, occasional blackouts and hallucinations, decayed teeth, edema in the legs, high blood pressure, and financial and marital problems. (N.T., 11/22/94, pp. 11–13). Dr. Sewards stated that he maintained a relatively normal medical practice during his alleged addiction of almost ten years, including the time of the charged offense.[7] He testified that he performed surgery, treated patients during office hours and prescribed medication on a regular basis. (N.T., 11/22/94, pp. 37–38). He also admits that his review of the six tape recordings made by the DEA of his dealings with Calabrese led him to conclude that he was not suffering from either blackouts or hallucinations, two of the symptoms he had described as representative of his addiction. (N.T., 11/22/94, pp. 32–34).

During this entire period, by his own admittance, Dr. Sewards was extremely reluctant to share the details of his addiction with anyone. (N.T., 11/22/94, pp. 13–14). In fact, he testified that he did not even inform his

---

**6.** Dr. Sewards warned Calabrese not to get him caught and also determined that if he himself were asked by government authorities why he had ordered so much diazepam he would justify it on the grounds that he had decided to give out diazepam in his office because patients had been forging prescriptions. *See* Transcript of tape of April 18, 1990.

**7.** Dr. Sewards testified that in January 1991 when he had reached the pinnacle of his addiction, he finally determined to wean himself off the amphetamines and "detoxed" in his parents' home for approximately six weeks. (N.T., 11/22/94, p. 22). Dr. Sewards alleges that he has remained free of drugs since that time. (N.T., 11/22/94, p. 27).

wife of his addiction until November 1992, several months after he was indicted. (N.T., 11/22/94, p. 25). Dr. Sewards alleges that, at his wife's prompting, he asked Mr. Heidecker whether his addiction had any bearing on his case but that Mr. Heidecker dismissed it out of hand and told the Sewards not to bring the issue up at trial.[8] Dr. Sewards stated that out of embarrassment he chose not to pursue the issue. (N.T., 11/22/94, 39–40). He also admitted that he had never been noticeably under the influence of drugs while in Mr. Heidecker's presence. (N.T., 11/22/94, p. 40). Mrs. Sewards also testified that she herself had raised the subject of Dr. Sewards' addiction with Mr. Heidecker while the three of them were in the car on the way to the trial. (N.T., 11/22/94, p. 65).

Attorney Heidecker testified that while he remembered Mrs. Sewards briefly bringing. up Dr. Sewards' "drug problem" in the car on the way to trial, Dr. Sewards himself made no mention of it at that point and in fact appeared to "tense up" at the mention of the problem. (N.T., 11/22/94, p. 70). He chose not to pursue the issue with Dr. Sewards at this point because Dr. Sewards was clearly embarrassed by the topic and also because he did not perceive it to be a defense, given the manner in which it had been raised. (N.T., 11/22/94, p. 75). Mr. Heidecker also stated that, in the eight months previous to the trial, he spoke with Dr. Sewards "repeatedly and continuously" about the evidence against him in the case and that neither Dr. or Mrs. Sewards had broached the subject of drug addiction previous to the day of the trial. (N.T., 11/22/94, pp. 71–72). He denied ever telling the Sewards not to mention the drug problem in court. (N.T., 11/22/94, p. 73). He also indicated that he had witnessed neither the blackouts or hallucinations described by Dr. Sewards nor any other symptoms that would have led him to believe that Dr. Sewards was under the influence of drugs. (N.T., 11/22/94, p. 74).

Mr. Heidecker also testified that before trial Dr. Sewards had asked what his chances of acquittal were and that he, Mr. Heidecker,

had responded that they were "very, very small." [9] (N.T., 11/22/94, p. 76). Based on this assessment, Mr. Heidecker advised Dr. Sewards to plead guilty since he faced a maximum sentence of three years if he proceeded to trial and was found guilty. Mr. Heidecker testified that after much discussion, the Sewards each decided that the correct course of action would be for Dr. Sewards to enter a guilty plea. (N.T., 11/22/94, p. 76). He stated that he asked Dr. Sewards several times if he was certain he wanted to enter a plea of guilty. (N.T., 11/22/94, pp. 76–77). He also stated that there was no mention of the drug addiction during these discussions (N.T., 11/22/94, p. 77). Dr. Sewards admits that he was not under the influence of narcotics at the time of the taking of his guilty plea. (N.T., 11/22/94, p. 29).

Finally, on cross examination, Mr. Heidecker stated that he does not believe that Dr. Sewards' drug addiction would have presented a viable defense at trial since he saw nothing to indicate that Dr. Sewards had been "deprived of any will." (N.T., 11/22/94, p. 81). He also noted that even if they had gone to trial, and he had been aware of the details of the drug usage, he would nevertheless have advised Dr. Sewards to proceed with the entrapment defense. (N.T., 11/22/94, pp. 81–82). We are satisfied with the testimony of attorney Heidecker and find it credible.

## II. ANALYSIS

▮ In his petition for habeas relief, Dr. Sewards raises two separate areas where he alleges that Mr. Heidecker's representation proved to be ineffective. Both these allegations are judged by the same two-prong Constitutional standard. In order to prevail on an ineffective assistance of counsel claim, defendant must show both "that counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strick-*

---

**8.** Mrs. Sewards corroborated the testimony of her husband. *See* N.T., 11/22/94, pp. 64–65.

**9.** Attorney Heidecker stated that he was going to proceed on an entrapment theory at trial. *See* N.T., 11/22/94, p. 76.

*land v. Washington,* 466 U.S. 668, 687–94, 104 S.Ct. 2052, 2065–68, 80 L.Ed.2d 674 (1984); *see also Reese v. Fulcomer,* 946 F.2d 247, 257 (3d Cir.1991), *cert. denied,* 503 U.S. 988, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992); *United States v. Gray,* 878 F.2d 702, 710 (3d Cir.1989). In *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), the Supreme Court held the test of *Strickland* to be applicable to ineffective assistance claims arising out of the plea process.

The burden of proof upon the defendant under *Strickland* is a heavy one, since there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *see United States v. Day,* 969 F.2d 39, 42 (3d Cir.1992); *see also Zettlemoyer v. Fulcomer,* 923 F.2d 284, 296 (3d Cir.1991) (defense counsel cannot be deemed ineffective just because counsel is not successful), *cert. denied,* 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 232 *reh'g denied,* 502 U.S. 1000, 112 S.Ct. 624, 116 L.Ed.2d 646 (1991). With this standard in mind, we will examine first Dr. Sewards' claim with respect to his guilty plea and will then consider his claim regarding Mr. Heidecker's representation at sentencing.

### A. *Knowing and Voluntary Guilty Plea*

The standard for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among alternative courses of action open to the defendant," *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970). "Ineffective assistance of counsel may render a guilty plea involuntary, and hence invalid." *Hill,* 474 U.S. at 56, 106 S.Ct. at 369.

Dr. Sewards alleges that the guilty plea he entered on December 8, 1992, was not knowing and voluntary because his decision to plead guilty was made without knowledge that his drug addiction could serve as the basis for a defense at trial. He claims he advised his attorney, Mr. Heidecker, that at the time of the charged offense he was addicted to drugs, but that Mr. Heidecker advised him not to make any reference to that addiction in Court. Dr. Sewards further al-

leges that if he had been aware that his drug addiction would have served as a viable defense to the specific intent requirement of the statute under which he pled guilty, he would have elected to pursue a jury trial and not have pled guilty. We find this argument to be without merit and hold that Dr. Sewards has not satisfied either prong of the *Strickland* test.

### 1. First Prong: Reasonableness of Attorney Conduct

In assessing an attorney's performance, *Strickland* instructs us to be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *U.S. v. Gray,* 878 F.2d 702, 710 (3d Cir.1989) (quoting *Strickland, supra* ). "It is therefore only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *Id.* at 711. In light of this standard, we must necessarily find that Mr. Heidecker's representation did not fall below the standard of reasonableness expected from a competent attorney. Our reasons for so holding are twofold.

First, we do not believe that Mr. Heidecker was directly informed by defendant of his drug addiction at the time in question. Mr. Heidecker testified at the hearing that it was his recollection that **Mrs. Sewards** first mentioned the drug addiction in the car on the way to trial. (N.T., 11/22/94, p. 70). When Mr. Heidecker looked over at Dr. Sewards, he "tensed up," and appeared embarrassed. (N.T., 11/22/94, pp. 70–71). There is no dispute that Dr. Sewards, aside from the physical reactions noted by Mr. Heidecker, said nothing at this point or onward regarding his drug addiction. And although both Dr. and Mrs. Sewards testified at the hearing that they had broached the topic of the drug addiction with Mr. Heidecker earlier, and that Mr. Heidecker had dismissed it out of hand, defendant admits that at no time did he ever detail any of the extent or the nature

of his alleged addiction to his attorney. (N.T., 11/22/94, pp. 39–40).[10] Furthermore, Dr. Sewards acknowledges that Mr. Heidecker never saw him while he was noticeably under the influence of drugs. (N.T., 11/22/94, p. 40).

Since we find that Mr. Heidecker was never informed directly by defendant of the specifics of his drug addiction, we cannot find, as a purely factual matter, that his conduct fell below an objective level of reasonableness. *See U.S. v. Gray,* 878 F.2d at 710 ("The reasonableness of counsel's actions may be affected by the defendant's actions and choices, and counsel's failure to pursue certain investigations cannot be later challenged as unreasonable when the defendant has given counsel reason to believe that a line of investigation should not be pursued.") (internal citations omitted); *see also Johnston v. State of Texas,* 750 F.Supp. 236, 240 (S.D.Tex.1990) (even if defendant was not competent at trial due to her abuse of alcohol, her voluntary impairment and her concealment of that impairment from her counsel was equal to forfeiture of her right to participate at trial).

Moreover, Mr. Heidecker testified that he did not pursue the drug addiction reference with Dr. Sewards both because he noted that Dr. Sewards appeared embarrassed by it and because he did not view it to be a viable trial defense, given the general manner in which it was broached. (N.T., 11/22/94, p. 75). Dr. Sewards is an extremely well-educated, knowledgeable and articulate individual who could have raised the issue directly with his attorney at any point. The fact that he was too embarrassed at the time to do so does not now offer him a legal basis to withdraw his plea. *See United States v. Lake,* 709 F.2d 43, 45 (11th Cir.1983) (Even assuming that defendant could make out a valid defense based on inability to form intent, he would not be entitled to withdraw a guilty plea where he discovered that defense six months after sentencing where the only assertion that plea was invalid is his absence of knowledge of the defense, and there is no claim that the government, his counsel, or

the court knew, or had any reason to know, of his condition).

Furthermore, while some attorneys may have pursued the possibility of a drug addiction defense more aggressively with their client, we do not find that Mr. Heidecker's failure to do so and his subsequent advice to plead guilty, given the great weight of the evidence against Dr. Sewards, falls below an objective level of reasonableness. In this holding we are supported by two cases from other circuits, the facts of which bear a striking similarity to the case at bar. In *Panuccio v. Kelly,* 927 F.2d 106 (2nd Cir.1991), a petitioner who had pled guilty to first-degree manslaughter appealed the denial of a writ of habeas corpus premised on the theory that his guilty plea had not been knowing and voluntary because his attorney had failed to advise him of a possible intoxication defense. The Second Circuit affirmed the decision of the district court and stated that,

> when a defendant has pled guilty on the advice of counsel and then challenges the plea on the ground that it was not voluntary and knowing because he was not apprised of an affirmative defense, we have upheld the validity of the plea unless the defendant can show that the advice he received from counsel was constitutionally ineffective within the meaning of the Sixth Amendment.

*Id.* at 111. The court held that petitioner had not been denied effective assistance of counsel because his attorney had no duty to inform defendant of this particular defense given his belief that it had almost no chance of success at trial and because it would have exposed defendant to significant additional punishment. *Id.* at 110–11 (quoting *Mitchell v. Scully,* 746 F.2d 951, 956–57 (2d Cir.1984), *cert. denied,* 470 U.S. 1056, 105 S.Ct. 1765, 84 L.Ed.2d 826 (1985) ("due process does not require that a defendant be advised of every basis on which he might escape or receive a lesser punishment for an offense that he has committed. The distinction is particularly strong where, as is the case here, the burden of persuasion with respect to the appropriate defense rests on the defendant.")).

10. In fact, defendant testified that he did not even inform his own wife of his addiction until

approximately November 1992, two months after he was indicted. (N.T., 11/22/94, p. 25)

Similarly, in *Evans v. Meyer*, 742 F.2d 371 (7th Cir.1984), petitioner appealed the denial of his writ of habeas corpus based on the theory that his counsel's failure to advise him that he might have an intoxication defense constituted ineffective assistance of counsel and thus made his plea of guilty involuntary. The Seventh Circuit affirmed the denial of the writ and held that, under the first prong of the *Strickland* inquiry, petitioner had not stated a claim for ineffective assistance of counsel since no "competent counsel" would have advised petitioner to risk going to trial on an intoxication defense. The uncontested facts surrounding the incident made it inconceivable that a jury would have acquitted petitioner because he was too intoxicated to form the intent necessary. *Id.* at 373–74. Since the intoxication defense was therefore, at best, only a "theoretical" possibility, petitioner's attorney, like the attorney in *Panuccio*, had been under no obligation to inform his client of it:

> It is not the normal practice of lawyers to advise their clients of every defense or argument or tactic that while theoretically possible is hopeless as a practical matter.... The fact that an intoxication defense may have been [defendant's] only possible defense to any of the charges against him would not change this conclusion. 'If there is no *bona fide* defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade.'

*Id.* at 374 (quoting *United States v. Cronic*, 466 U.S. 648, 656–57 n. 19, 104 S.Ct. 2039, 2045 n. 19, 80 L.Ed.2d 657 (1984)).

In the case at bar, as in the two cases discussed above, the drug induced intoxication defense was at best a "theoretical" possibility that had virtually no hope of success at trial. Mr. Heidecker testified at the hearing that even though it was his belief that the chances of acquittal were "very, very small" on the entrapment defense theory at trial, he would nevertheless have advised Dr. Sewards to proceed on that theory if he chose to go to trial rather than any drug induced intoxication defense. (N.T., 11/22/94, pp. 82–84). He also stated that after his many discussions of the case with Dr. Se-

wards and his review of the tapes, it was his belief that Dr. Sewards had not been "deprived of any will." (N.T., 11/22/94, p. 81). Consequently, it would have in fact been ineffective assistance of counsel for Mr. Heidecker to have advised Dr. Sewards to proceed on such a theory. In any case, his alleged mere failure to discuss the defense with Dr. Sewards did not render his assistance ineffective.

Secondly, defendant boldly represented to this court at the taking of his guilty plea that he was fully satisfied with his attorney's performance and denied any problem with drugs. The Supreme Court has held that,

> the representations of the defendant, his lawyer, and the prosecutor at [a plea hearing], as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Blackledge v. Allison*, 431 U.S. 63, 73–74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977). This admonition is all the more potent in a § 2255 proceeding, as is the case here, where the same judge who reviews the § 2255 petition presided over the original conviction and sentencing. *Id.* at 74, n. 4, 97 S.Ct. at 1629, n. 4. *See also United States v. Rivera–Ramirez*, 715 F.2d 453, 458 (9th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364, *reh'g denied* 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 871 (1984) (defendant's statement at plea hearing, at which he pled guilty, that he was satisfied with the representation he had received, carried a strong presumption of verity); *Baker v. United States*, 781 F.2d 85, 90 (6th Cir.1986), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 667, 93 L.Ed.2d 719 (1986) (where the district court has scrupulously followed required procedure for taking a guilty plea, the defendant is bound by his statement in response to the district court's inquiry); *Hedman v. United States*, 527 F.2d 20, 22 (10th Cir.1975) (defendant's § 2255 allegations of involuntary plea

and ineffective assistance of counsel did not trigger hearing requirement since they were completely refuted by his earlier statements made at his guilty plea colloquy).

This court conducted a comprehensive on-the-record colloquy pursuant to Fed. R.Crim.P. 11, on December 8, 1992.[11] Dr. Sewards answered in the negative when we asked him whether he had been treated for alcohol or drug addiction or mental illness and whether he had taken any drugs or alcohol that day or the day previous.[12] Dr. Sewards answered in the affirmative when

we inquired whether his attorney had fully gone over the case and charges against him, whether Dr. Sewards had had enough time to talk with his attorney, and whether his attorney had performed to his satisfaction.[13] Dr. Sewards answered in the affirmative when we asked whether he understood the elements of the offense with which he was charged,[14] the maximum penalties that could be imposed against him,[15] and his understanding of the consequences of his actions in pleading guilty, including the possible loss of his medical license.[16] Finally, Dr. Sewards

---

11. Rule 11(c) of the Federal Rules of Criminal Procedure requires that before a district court may accept a guilty plea, the court must "inform the defendant of, and determine that the defendant understands," a "laundry list of information regarding the defendant's rights and the consequences of his or her plea." *See United States v. Cleary,* 46 F.3d 307 (3d Cir.1995).

12. COURT: All right. Have you ever been treated for drug or alcohol addiction or for mental illness?
DEFENDANT: No.
COURT: Have you had any drugs or alcohol today?
DEFENDANT: Pardon me?
COURT: Have you had any drugs or alcohol today, sir?
DEFENDANT: No, sir.
COURT: All right, how about yesterday?
DEFENDANT: No.
*See* N.T., 12/8/92, p. 4.

13. COURT: Has your lawyer gone over this case with you and the charges against you, and was he fully prepared to take this case to trial today?
DEFENDANT: Yes.
      \*    \*    \*    \*    \*    \*
COURT: All right. Do you feel you've had enough time to talk this over with your lawyer this morning?
DEFENDANT: Yes, sir.
COURT: So far has he done everything for you that you wanted him to do?
DEFENDANT: Everything.
*See* N.T., 12/8/92, pp. 5–6.

14. COURT: Do you understand the elements of the offenses charged, that the Government in order to prove you guilty of the offense for which you're charged, which is distribution of Diazepam, would have to prove three elements beyond a reasonable doubt. They would first have to prove that at or about the time—which means reasonably near the time—named in the indictment that you did distribute, possession with intent to distribute—I'm sorry, that you did distribute or caused to be distributed a controlled substance—the term distribute means to deliver

to another person, that is, to transfer the controlled substance to another person. They would secondly have to prove that you acted knowingly or intentionally, that is, that you did what you did willfully and voluntarily and not by mistake or by accident or for some innocent reason. And the third thing they would have to prove beyond a reasonable doubt is that at the time you did that you were not acting in the usual course of your medical practice and not acting for a legitimate medical reason, do you understand that?
DEFENDANT: Yes.
*See* N.T., 12/8/92, pp. 14–15.

15. COURT: Do you understand the maximum penalties that can be imposed for this offense? I'll let the Government state that.
MR. STOUT: Your Honor, the maximum penalty is three years imprisonment, a fine of $250,000 and a one-year period of supervised release and a mandatory special assessment of $50.
COURT: Do you understand those penalties?
DEFENDANT: Yes.
*See* N.T., 12/8/92, p. 9.

16. COURT: Okay. You understand that you will be entering a plea to a felony, that you'll be found guilty of a felony by me, that may deprive you of in effect valuable civil rights, such as the right to vote, hold public office, serve on a jury and possess a firearm, it may very well affect your license to practice medicine, you may be suspended from the practice of medicine, do you understand that?
DEFENDANT: Is that forever I may be suspended?
COURT: I can't answer that—
DEFENDANT: Okay.
COURT: —that's up to the state board that licenses you. What states are you licensed in?
DEFENDANT: Pennsylvania.
COURT: All right. Again, that's up to them, but I will tell you right now one of the very first things we're going to do after you plead guilty is a certified copy of this will go the State Board of Medical License, it's part of our job, you understand that?

answered in the affirmative when we asked whether he was entering his plea voluntarily.[17]

The Supreme Court has stated that the "presumption of verity" attached to statements made at a guilty plea colloquy "although imposing, is not invariably insurmountable." *Blackledge*, 431 U.S. at 74, 97 S.Ct. at 1629. However, in *Blackledge* the Court noted the specific circumstances in which the presumption may not attach as being situations of "misunderstanding, duress, or misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for imprisonment." *Id.* at 75, 97 S.Ct. at 1630.

Petitioner presented himself to us at the guilty plea and sentencing as a well-educated and articulate individual who had full knowledge of his constitutional rights and related matters, evidenced satisfaction with his lawyer, and yet asserted his continuing desire to plead guilty.[18] At his habeas hearing, however, petitioner attempted to paint the picture of a man who was completely and uncontrollably addicted to amphetamines for a period of many years and therefore not in control of his faculties. Obviously the hope was that this somehow should absolve him for responsibility for his actions by placing the blame on his attorney for not representing him competently. We are of the opinion, however, that petitioner, a highly educated individual, had more than ample opportunity and faculty to disclose his alleged problem to his attorney. Instead, he chose to ignore not only the ethical and moral standards of his profession, but the oath that had been administered by this court. Since defendant has not demonstrated that the factors surrounding his situation fall into the exceptions laid out by the Supreme Court in *Blackledge*, we find that defendant has not overcome the strong presumption of verity we attribute to his sworn representations at the plea proceeding at which he evidenced his complete satisfaction with the representation of his counsel.

Moreover, Dr. Sewards' sworn statements at the time of his guilty plea belie any assertion he now makes that his guilty plea was not knowing and voluntary and indicate instead that his decision to plead guilty was premised upon his awareness of the overwhelming evidence accumulated against him and his fear of receiving a long jail sentence if found guilty at trial:

> I felt that because of the evidence, every time I'd go through the tapes and listen to the tapes it just worried me that I didn't have a good defense that I did this for a legitimate medical purpose, but when I listened to what I was saying to this person it doesn't sound good to me either and I'm not even a juror. And it came down to am I willing to risk a long jail sentence with having children who are 16, 12 years old, five years old, miss the rest of their high school days and I thought the risk of that happening if I were to lose, you know, something that I was real unsure about it just outweighed any chance of doing that and I thought it was better to say, well, I made a mistake here, whether it was for a legitimate purpose or not, I made a mistake even in dealing with this particular patient. And I think I'm just better off admitting, yeah, I made a mistake.

(N.T., 12/8/92, pp. 5–6). *See Evans*, 742 F.2d at 375 (A guilty plea need not be perfectly informed in order to be voluntary). Consequently, it cannot be said that under the circumstances of this case Mr. Heidecker's recommendation that Dr. Sewards plead guilty was outside "the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970).

### 2. Second Prong: Prejudice

Even if Dr. Sewards had demonstrated that his attorney's conduct failed to meet the

---

DEFENDANT: Yes.
*See* N.T., 12/8/92, p. 8.

**17.** COURT: All right, all right. So, you're doing this of your own free will?
DEFENDANT: Yes.
*See* N.T., 12/8/92, p. 8.

**18.** Based on Dr. Sewards answers to the questions presented to him, and our observance of his demeanor, we made a general finding that Dr. Sewards was fully competent and capable of entering an informed plea, and that his guilty plea was knowing and voluntary. *See* N.T., 12/8/92, p. 19.

reasonableness prong of the *Strickland* inquiry, we find that he would be unable to demonstrate prejudice as a result of his attorney's deficiency. As required by *Strickland,* petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068; *see also United States v. Day,* 969 F.2d at 45; *United States v. Baynes,* 687 F.2d 659, 670 (3d Cir.1982).

This prong of the *Strickland* inquiry is not satisfied merely by defendant's testimony that "he would have gone to trial had he known of the defense ... since a defendant's testimony suffers from obvious credibility problems." *Panuccio,* 927 F.2d at 109 (internal citations omitted). "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill,* 474 U.S. at 59, 106 S.Ct. at 371. "Such a showing may not be based on mere speculation.... Under usual circumstances, we would expect that ... information [obtained through an adequate investigation] would be presented to the habeas court through the testimony of the potential witnesses." *U.S. v. Gray,* 878 F.2d at 712 (internal citations omitted).

Evaluating the testimony presented by defendant at his hearing as representative of the information his attorney would have presented at trial to support his theory of lack of intent, "we must assess this evidence in relation to the record as a whole to determine whether there is a reasonable probability that such evidence, if presented to a jury acting conscientiously and impartially would have led the jury to have a reasonable doubt respecting [Dr. Seward's] guilt." *Id.* at 713. A careful review of this evidence leads us to conclude that while Dr. Sewards testified at

length at the hearing about the effects of his alleged drug addiction, there is no reasonable probability that a jury could find that Dr. Seward's addiction actually affected his ability to form the requisite intent.

In support of this conclusion, we make the following observations. First, Dr. Sewards testified that he took amphetamines on an almost regular basis from 1981 to approximately 1991. (N.T., 11/22/94, p. 6). During this time, however, he continued to regularly treat patients, prescribe medication, and even perform surgery. (N.T., 11/22/94, pp. 37–38). If his testimony is true, Dr. Sewards must have developed a tolerance for amphetamines that allowed him to perform these duties with a certain level of competence. Given the grave and complicated nature of a procedure such as surgery, we find utterly disingenuous his claim that he was unable at this time to form the intent necessary for a simple act of "knowingly and intentionally" distributing the four thousand tablets of diazepam he pled guilty to distributing.[19] Dr. Sewards is not even claiming that on the date of the charged offense he took a dosage of amphetamines larger than what he usually took nor is he maintaining that he has no memory of the events that occurred on the tape. (N.T., 11/22/94, p. 19). Moreover, he admits that there is no independent evidence of either the blackouts or hallucinations he described at the hearing on the tapes. (N.T. 11/22/94, pp. 31–33).

In fact, Dr. Sewards can point to no specific behavior on the tapes that would even remotely suggest that he was under the influence of drugs to such a degree that he would have been unable to form the requisite intent save the fact that he consistently ordered more drugs than he needed for his patients. (N.T., 11/22/94, p. 21). We find this excuse to be utterly meritless, and in fact, our previous review of the tapes and our recent review of the transcripts of these tapes, reveal a lucid individual completely in control of his faculties and aware of his ac-

19. "A conviction for possession with intent to distribute a controlled substance requires that one knowingly and intentionally possessed the substance with the intent to distribute." *United States v. Salmon,* 944 F.2d 1106, 1113 (3d Cir.

1991), *cert. denied by Washington v. U.S.,* 502 U.S. 1110, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992) (quoting *United States v. Martorano,* 709 F.2d 863, 866 (3d Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983)).

tions. For instance, on the tape it is clear that defendant obviously was aware of the illegality of his actions and he in fact went so far as to manufacture an excuse in case he got caught.[20] Furthermore, the fact that defendant charged $55 for a bottle of diazepam for which he paid $9, coupled with the numerous references on the tapes to his financial problems, evidence the motive behind his activities.

In reaching the conclusion that Dr. Sewards was able to form the requisite intent, we found credible and helpful the testimony of Dr. George Woody, the government expert witness. Dr. Woody noted the symptoms of amphetamine abuse,[21] and testified that after a review of the transcripts of the six separate occasions on which Dr. Sewards was taped, it was his opinion that none of the symptoms of amphetamine abuse were exhibited. (N.T., 11/22/94, pp. 91–95). Dr. Woody distinguished the ability to form intent from judgment, which is the individual's ability to inhibit the impulses that would be formed as part of the intent. (N.T., 11/22/94, p. 93). He testified that amphetamine addiction could result in impaired judgment but would not affect the ability to form the intent necessary to dispense and transfer drugs. (N.T., 11/22/94, pp. 92–93).

By contrast, we found the testimony of Dr. Ralph Stolz, defendant's expert witness, to be somewhat irrelevant and misleading to the issue at hand. While he testified that he thought Dr. Sewards' judgment was severely impaired at the time of the charged offense, he did not directly address the issue of Dr. Sewards' ability to form intent at that time. Moreover, in making this determination, Dr. Stolz had not reviewed transcripts of the tapes, (N.T., 11/22/94, pp. 53–54) nor had he been treating or had contact with Dr. Sewards at the time of the charged offense. (N.T., 11/22/94, pp. 52–53). His determination was based almost entirely on what had

20. SEWARDS: How big a case how many do you want.
INFORMANT: What do they come 24 in a case.
SEWARDS: I don't know how many are in a case. I mean I order bottles of 500 ... 450 dollars for em, that'll buy a fair amount.
INFORMANT: Huh.
SEWARDS: That buy a fair amount.
INFORMANT: Well how much you want for them.
SEWARDS: A thousand ... I don't know well how much can you afford.
INFORMANT: I don't know well er I can bring up half the money in a couple of days ... and then the other half when you get em in.
SEWARDS: I don't know give me a hundred bucks that'll be good.
INFORMANT: Huh.
SEWARDS: You give me a hundred bucks for em tha'll be good ... I give you five thousand of em ... you pay for em that'll be 550 for five thousand.
INFORMANT: You want 550.
SEWARDS: I'll get five thousand for you, you better not fucking ever get me caught.
INFORMANT: Hey. I didn't fucking say anything when I got busted in Jersey.
SEWARDS: Well it just it really worried me that they started cracking down on the rest of these guys. I'm sure they come out without a leg to stand on, bank take their license, tha's all I need.
INFORMANT: That one doctor they fucking caught had no patients.
SEWARDS: I know but still I mean their looking you....
INFORMANT: Yeah.

SEWARDS: I see that you know I, I realize that these guys have probably been under investigation for a long time they probably are really abusing the whole thing and you know there exception but still if there is any inkling of that they want to make an example out of ya, and I don't need that.

\*   \*   \*   \*   \*   \*

SEWARDS: I've got a fairly good excuse for doing it people been forging prescriptions with stuff for a long time so i/a prescriptions i/a I'll just say I'm not writing prescriptions any more I'm giving the stuff out in my office. In that way I know what I'm doing.
INFORMANT: Yeah.
SEWARDS: So that's the excuse I can use in case just be careful ... It'll be pretty tough to come up with an excuse why you have five thousand.
INFORMANT: I/a I'll save em till I move and take em with me.
SEWARDS: Ok.
INFORMANT: I know take care.
*See* Transcript of tape of 4/18/90.

21. The symptoms described by Dr. Woody are as follows: dependence, abuse, intoxication, withdrawal, delirium, psychotic disorders associated with intoxication, mood disorders associated with intoxication or withdrawal, anxiety disorders associated with intoxication, sexual dysfunctions associated with intoxication and sleep disorders associated with intoxication or withdrawal. *See* N.T., 11/22/94, p. 91 (quoting from The Diagnostic and Statistical Manual of Mental Disorders (4th ed.)).

been relayed to him by Dr. Sewards. (N.T., 11/22/94, p. 53). Consequently, while it may be that defendant suffered from some impaired judgment, we have seen no evidence to indicate that he was unable to form the requisite intent. *See United States v. Sauer,* 1994 WL 424266 (7th Cir.1994) (affirmed finding of district court which found defen-. dant still had ability to form specific intent despite testimony of drug counselor at trial that indicated that defendant was severely addicted to cocaine at the time of the charged offense.).

Defendant's reliance on *U.S. v. Pohlot,* 827 F.2d 889 (3d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988), is misplaced. In *Pohlot,* the Third Circuit interpreted the Insanity Defense Reform Act, 18 U.S.C. § 17, (hereinafter "IDRA"), which Congress passed to ensure that "the insanity defense is not improperly resurrected in the guise of showing some other affirmative defense, such as that the defendant had a diminished responsibility or some similarly asserted state of mind which would serve to excuse the offense and open the door, once again to needlessly confusing psychiatric testimony." *Id.* at 896.[22] Defendant maintains that *Pohlot* stands for the proposition that a defendant may introduce psychiatric evidence for the purpose of casting doubt upon the government's proof of specific intent. Mr. Heidecker was inadequate in his counsel, the argument continues, because he failed to

investigate Dr. Sewards' severe drug addiction, and its corresponding impact on his mental health, thus foregoing a viable trial defense. "Given the government's evidence against petitioner, no other real avenue of defense was open." Defense Memorandum of Law in Support of Petition to Vacate Conviction and Sentence at 7.

In *Pohlot* the Third Circuit held that while the IDRA prohibits a defendant from introducing evidence of mental abnormality in order to establish a "diminished responsibility" or "diminished capacity" defense, it does not prevent a defendant from introducing evidence of mental abnormality in order to negate mens rea and disprove an element of the crime itself. *Id.* at 897 (citing as support H.R.Rep. No. 98–577, 98th Cong. 1st Sess. (1983) and S.Rep. No. 98–225, 98th Cong., 2d Sess. (1984)).[23] The court noted, however, that evidence introduced to prove that the defendant actually lacked mens rea, was to be distinguished from evidence offered to prove that defendant lacked the capacity to form mens rea. They also found that only the former is permitted by the IDRA, *id.* at 905, and even then "[d]istrict courts should admit evidence of mental abnormality on the issue of mens rea only when, if believed, it would support a legally acceptable theory of lack of mens rea." *Id.* at 905–06.[24] The court cautioned, that "[o]nly in the rare case, however, will even a legally insane defendant

---

**22.** The IDRA was enacted in 1984 following the Hinckley assassination attempt on President Reagan for the principal purpose of narrowing the scope of the traditional insanity defenses. It did this by defining the available defense as a narrow, affirmative one that "the defendant was unable to appreciate the nature and quality or the wrongfulness of his acts," and by then providing that, "[m]ental disease or defect does not otherwise constitute a defense." 18 U.S.C. § 17(a). The principle effect of the narrowing was to eliminate the volitional prong of the preexisting test which made it a defense that though aware of its wrongfulness, a defendant was unable to conform his conduct to the law. *See Pohlot,* 827 F.2d at 896. Furthermore, the burden is on the defendant to prove the defense of insanity by clear and convincing evidence. 18 U.S.C. § 17(b).

**23.** The court noted that this holding was in accordance with the IDRA because "admitting psychiatric evidence to negate mens does not consti-

tute a defense but only negates an element of the offense, § 17(a) by its terms does not bar it. Section 17(a) states only that 'mental disease ... does not otherwise constitute a defense;' it does not purport to establish a rule of evidence." *Pohlot,* 827 F.2d at 897.

**24.** With regard to the defense that defendant lacked the capacity to form mens rea, the court noted, "[c]ommentators have agreed, however, that only in the most extraordinary circumstances could a defendant actually lack the capacity to form mens rea as it is normally understood in American law...." Even the most psychiatrically ill have the capacity to form intentions, and the existence of intent usually satisfied any mens rea requirement. Commentators have therefore argued that permitting evidence and arguments about a defendant's capacity to form mens rea distracts and confuses the jury from focusing on the actual presence or absence of mens rea. *Pohlot,* 827 F.2d at 903–04.

actually lack the requisite mens rea purely because of mental defect." *Id.* at 900.

We find that defendant at trial would be unable to avail himself of the narrow exception laid out by the Third Circuit in *Pohlot.* First, we believe defendant would present evidence that impacted on his capacity to form mens rea which is clearly prohibited by *Pohlot.* Second, even if this were not the case, the *Pohlot* court directed district courts to evaluate carefully proffered psychiatric testimony to determine, among other things, if the testimony would actually "aid the jury in deciding the ultimate issues." *Id.* at 905. Given the fact that we found previously that Dr. Stolz's testimony was misleading in that it failed to directly address the issue of intent, we believe that there is a high probability that defendant's proffered psychiatric testimony would barred from admission at trial for fear of jury confusion.[25] *See* F.R.Evid. 702 (expert testimony admissible only when the specialized knowledge of the expert will assist the trier of fact in understanding the evidence or in determining a fact in issue). Finally, while defendant presented testimony about his drug addiction, he presented virtually no evidence that indicated the direct impact, if any, of this addiction on his actual ability to form intent. Thus his ability to fall under the auspices of the IDRA is questionable.[26] *See United States v. Lyons,* 731 F.2d 243, 245 (5th Cir.1984), *cert. denied,* 469 U.S. 930, 105 S.Ct. 323, 83 L.Ed.2d 260 (1984) (and cases cited therein) (evidence of mere narcotics addiction, standing alone and without other physiological or psychological involvement, raises no issue of such a mental defect or disease as can serve as a basis for the insanity defense).

Petitioner bears the burden of coming forward at his habeas hearing with the relevant specific information he would have presented at trial, save for his attorney's errors. *See U.S. v. Gray,* 878 F.2d at 712. Dr. Sewards has presented no evidence that would indicate that there was even a remote possibility, ·let alone a reasonable probability, that a jury would find that he had been unable to form the requisite intent to knowingly and intentionally distribute narcotics. Consequently, we find that he has failed to meet the second prong of the *Strickland* inquiry. *See Evans v. Meyer,* 742 F.2d at 375 ("It is inconceivable to us, and not merely improbable ... that [defendant] would have gone to trial on a defense of intoxication, or that if he had done so he either would have been acquitted, or if convicted, would nevertheless have been given a shorter sentence than he actually received."); *see also Pacelli v. United States,* 508 F.Supp. 496, 507 (S.D.N.Y.1980), *aff'd* 659 F.2d 1061 (2d Cir.1981), *cert. denied* 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982) (where allegations of petitioner lack detailed factual allegations in support thereof and are speculative, conjectural and conclusory, particularly in respect to actual knowledge and intent, a petition to vacate, set aside or correct a sentence may be rejected on that ground alone).

## B. *Mitigation of Sentence for Drug Addiction*

■ Petitioner also argues that Mr. Heidecker rendered ineffective assistance of counsel by failing to present evidence of Dr. Sewards' drug addiction at sentencing under

25. The Fourth Circuit in *United States v. Moran,* 937 F.2d 604 (4th Cir.1991) (unpublished opinion), affirmed the decision of a district court to exclude the testimony of an expert witness who would testify on behalf of defendant that her cocaine addiction caused a mental condition which negated her mens rea. *Id.* at 2. This testimony would have been offered in support of defense theory that defendant's "cocaine addiction had so far impaired her mental capacity to consider the drug for any purpose but personal use that she literally could not have formed the specific intent to distribute it or to conspire with others to distribute it." *Id.* at 3. The Fourth Circuit held that the testimony was properly excluded because of the great danger that it would

"distract the jury from focusing on the actual presence or absence of mens rea" and that "it may easily slide into wider usage that opens up the jury to theories of defense more akin to justification." *Id.* at 3 (quoting *United States v. Cameron,* 907 F.2d 1051, 1067 (11th Cir.1990), quoting *Pohlot,* 827 F.2d at 904–06).

26. Defense counsel in fact acknowledges in his Memorandum of Law that defendant would have "difficulty" "in proving insanity by clear and convincing evidence." Defendant Memorandum of Law in Support of Petition to Vacate Conviction and Sentence at 7–8, n. 3.

U.S.S.G. § 5K2.13.[27] We find petitioner's argument to be without merit and hold that he has failed to meet either prong of the *Strickland* inquiry.

First, since we have already found above that Mr. Heidecker was never directly informed by defendant of the specifics of Dr. Sewards' drug problem, it was certainly not unreasonable for Mr. Heidecker not to move for downward departure under § 5K2.13. At the sentencing, Mr. Heidecker argued convincingly, albeit unsuccessfully, for downward departures based on § 5K2.12 (coercion and duress) and § 5K2.0(II) (aberrant behavior). We have been offered no reason to believe that Mr. Heidecker would not have argued as convincingly for a downward departure based on § 5K2.13 if he had been aware of the circumstances surrounding the addiction and had held a good faith belief that the circumstances were such that are covered by § 5K2.13.

Second, even if we had found that Mr. Heidecker had rendered ineffective assistance, petitioner has not overcome the prejudice prong of *Strickland.* While § 5K2.13 allows for a reduction in sentence based on a defendant's reduced mental capacity, it expressly excludes a reduction for reduced mental capacity due to "voluntary" drug usage. *United States v. Anders,* 956 F.2d 907 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1592, 123 L.Ed.2d 158 (1993); U.S.S.G. § 5H1.4 (drug dependence or alcohol abuse is not a reason for imposing a sentence below the guidelines); *see also U.S. v. Salmon,* 944 F.2d at 1130 (Eight Amendment does not guarantee a defendant sentencing which considers mitigating circumstances such as his drug addiction). Petitioner has not demonstrated that his drug addiction resulted in a physical or mental impairment that would qualify for downward departure under § 5K2.13. Therefore we find that petitioner suffered no prejudice since he would not have successfully been able to avail himself of this section. Moreover, the sentencing guideline range if a departure had been granted would have been the same as that which defendant was actually sentenced under (0–6 months). When we denied petitioner's other motions for downward departure we stated that our imposed sentence of three months would not have changed even if we had granted the departure(s). (N.T., 4/7/93, p. 91). We state the same here. Consequently, petitioner has not stated a claim for ineffective assistance of counsel due to his attorney's failure to present mitigating evidence of his drug addiction.

## III. CONCLUSION

For the reasons outlined in the foregoing opinion, we deny Dr. Sewards' petition pursuant to 28 U.S.C. § 2255 to withdraw his guilty plea, vacate his conviction and sentence.

---

**27.** U.S.S.G. § 5K2.13 states:

If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.